JAMES NEWMAN;

       Plaintiff;

    v.

GAGAN LLC; THINK TANK SOFTWARE
DEVELOPMENT CORP.; DIRECTBUY, INC.;
UNITED CONSUMERS CLUB
INCORPORATED; LAURIE GAGAN, in her
individual capacity; and JAMES GAGAN, JR.,
in his individual capacity;

       Defendants.

Civil Action No. 2:12-CV-248-JVB-PRC

## OPINION AND ORDER

This case arises from alleged wrongful discharge, breach of the duty of good faith and fair

dealing, promissory estoppel, and violations of the Americans with Disabilities Act ("ADA") and

Family and Medical Leave Act ("FMLA"). James Newman brings these causes of action against

four business entities, all of which he contends should be treated as his employers, as well as two

individuals he claims were his supervisors. Invoking Federal Rule of Civil Procedure 12(b)(6),[1]

two groups of Defendants have each moved separately to dismiss the Complaint for failure to

state a claim upon which relief can be granted. In responding, Newman has shown a plausible

entitlement to relief on his ADA and FMLA causes of action, as well as the claim for wrongful

discharge. The same cannot be said of his counts for promissory estoppel and breach of the duty

of good faith and fair dealing.

---

[1] All references to a "Rule" in this Opinion and Order indicate one of the Federal Rules of Civil Procedure.

## A. Background

### 1. Newman's Complaint

For the reader's convenience, the Court provides the following summary of what Newman has alleged in his Complaint.

Gagan LLC, Think Tank Software Development Corp. ("Think Tank"), [2] United Consumers Club Incorporated ("UCC"), and DirectBuy Inc. ("DirectBuy") "share common management, interrelation among/between their operations, centralized control of their human resources/benefits, and a degree of common ownership and control." (*Id.* ¶ 49.)

In May 2010, Newman and employers Gagan LLC and Think Tank, entered into the "Employment Agreement" attached to the Complaint at Exhibit A, which he incorporated into the Complaint by reference. (Compl. ¶ 10, 1 n.1.) That contract, which superseded "all prior agreements" between the parties regarding Newman's employment, was on its face an integration of their "entire understanding and agreement." (Ex. A to Compl., ¶ 18.) It made him an employee at will and prohibited him from taking on other employment. (Ex. A ¶ 6; Compl. ¶ 10.) He closed his private business to comply. (*Id.* ¶ 10.) Newman's initial title as these Defendants' employee was Accounting Business Analyst, and his duties entailed what one would expect from his title, plus some human-resources work. (*See id.* ¶¶ 12, 14.) At the outset, Newman's "immediate supervisors" were Laurie Gagan, an employee of DirectBuy and Think Tank, and James Gagan, Jr. (*See id.* ¶¶ 5 (labeling "DirectBuy, Inc." as "DirectBuy"), 16 (calling Laurie Gagan an employee of "DirectBuy").)[3] The Complaint does not particularly describe

---

[2] This Opinion and Order refers to Gagan LLC, Think Tank, Laurie Gagan, and James Gagan Jr. collectively as "the Gagan Defendants."

[3] Newman has equivocated in his use of the name "DirectBuy," applying it in some instances to the apparent franchisee that was Gagan LLC, doing business as DirectBuy Southlake, and in others to DirectBuy, Inc., an alleged franchisor.

Gagan LLC's or Think Tank's businesses, but explains that DirectBuy "is a franchisor whose franchises operate 'buying clubs' that permit members to purchase merchandise directly from manufacturers at reduced prices." (*Id.* ¶ 6.) "UCC is the parent company of DirectBuy. Inc.," and "exercises control over DirectBuy's operations and personnel decisions." (*Id.* ¶ 5.)

When he began, Newman was "being groomed as Gene Deutsch's replacement as Chief Financial Officer of the business entities commonly referred to as the Gagan Family of Companies." (*Id.* ¶ 16.) He intended to stay with that family of companies until retirement. (*Id.*)

In conclusory terms, Plaintiff has alleged in paragraph 18 that he was at all relevant times "a qualified individual with a disability," and had "a record of impairment," or was perceived as disabled by the Defendants. Newman "took several prescribed [though unspecified] medications," without which he was "substantially limited in activities that are of central importance to his daily life." (*Id.* ¶ 19.)

Before about January 14, 2011, when "Newman suffered a serious [unnamed] physical injury at work," the Defendants had no qualms with his performance of the job and had not attempted to control the administration of his medications. (*Id.* ¶ 20.) Newman doesn't say what happened for the following three months or so, but his treating physician "released him to return to work with given medical restrictions" as of April 18, 2011. (*See id.* ¶¶ 20–22.) Beginning then, Newman could perform sedentary work duties eight hours per day and forty hours per week, but he had to use crutches while moving about, bearing weight on an apparently injured leg only "as tolerated." (*See id.* ¶ 22.) Newman was restricted from lifting over ten pounds, operating machinery, and even working in the presence of clutter.[4] (*See id.*)

---

[4] Yes, *clutter*. *Cf.* http://fengshui.about.com/od/thebasics/qt/clearclutter.htm, last visited Mar. 25, 2013 ("Clutter is low, stagnant, and confusing energy that constantly drains energy from you.").

Newman asked for accommodation of these medical restrictions, although the Complaint doesn't reveal how, when, or of whom precisely. (*See id.* ¶ 23.) He obtained from the Indiana Department of Motor Vehicles a placard, and, in what may or may not have been a separate incident from the events alleged in paragraph 23 of the Complaint, asked for a handicapped parking space. (*See id.* ¶ 24.) "Defendants refused Newman the use of a handicapped parking space;" they didn't have one. (*Id.* ¶ 36.)

"A meeting was scheduled for Newman with Laurie Gagan and Jim Gagan Jr., around April 18, 2011, to discuss Newman returning to work to perform his accounting duties for Defendants. Newman believed he could perform his accounting business analysis and human resources job duties with or without accommodation." (*Id.* ¶ 25.)

But at some unstated time, Newman hired a lawyer, and Defendants learned of this "around April 15, 2011." (Id. ¶ 26.) The April 18 meeting then "was cancelled." (*Id.*)

Ultimately, Defendants "refused to accommodate Newman's given medical restrictions," telling him the restrictions first would have to be lifted, or at least changed. (*Id.* ¶ 27.) "Around June 8, 2011," Newman became informed that Gagan LLC and Think Tank had "decided to eliminate his position of accounting business analyst." (*Id.* ¶ 28.) Gagan LLC and Think Tank placed Newman on a leave of absence, and said they would consider him for future openings once "fully released" by his doctor to return to work. (*Id.* ¶ 29.) They later replaced Newman with Jennifer Jimenez as Accounting Business Analyst. (*See id.* ¶ 30.) Jimenez had less education and experience than Newman (*id.* ¶ 15), and eventually asked Newman for some help. (*Id.* ¶ 30.)

About two days after Newman learned the Defendants were eliminating his position; that is, around June 10, 2011; his doctor released him to come back without a limitation to sedentary

work or a lifting restriction. (*See id.* ¶ 31.) Newman was directed to use a cane from that time on, and to continue prescription pain medication. (*Id.*)

Around the following week, he received "a letter offering him the position of Assistant Marketing Room Manager," a position that entailed a "decreased rate of pay." (*Id.* ¶ 34.) Newman took the offer, and returned to work "around June 21, 2011." (*Id.* ¶ 35.) But Laurie Gagan then sought to "take possession" of and administer Newman's medications to him, which he refused. (*Id.*) The details of this are unclear, but somehow "Defendants caused Newman to work without taking prescription medications related to his impairment and/or perceived disability during his working hours." (*Id.*)

Once moved into the marketing room, Newman came under the supervision of Marketing Room Manager Don Sone. (*Id.* ¶ 37.) Sone's employers were DirectBuy and UCC. (*Id.*) Gagan LLC directed Sone's work, and "controlled his work schedules." (*Id.*) Sone "used Gagan's workplace, equipment, supplies and staff to perform his job functions at DirectBuy and UCC." (*Id.*)

Newman did not have managerial duties in the marketing room, but rather worked as a telemarketer, in isolation from coworkers, offering DirectBuy memberships to "citizens," while subject to routine monitoring by Laurie Gagan "and/or" James Gagan Jr. (*See id.* ¶¶ 38, 39.) Though other marketing employees received a week of training, Newman got just one day. (*See id.* ¶ 41.) Nevertheless, he performed his duties satisfactorily. (*See id.* ¶ 42.)

Despite his satisfactory performance, within a week of Newman's return to work, unspecified "Defendants prepared multiple written disciplinary actions" for him that he disagreed with. (*Id.* ¶ 45.) In the same week, around the day before he was ultimately terminated, Newman requested time off from work for two doctors' appointments, relating to his "known impairment" and

"work injury," as well as "future FMLA leave related to the birth of his . . . child." (*See id.* ¶¶ 43, 44.) Finally, around June 28, 2011, "Defendants" terminated Newman, ostensibly for "violating rules that allow marketing room staff to be sent home when any rule is broken." (*Id.* ¶ 47.)

In Count I, Plaintiff seeks to plead a claim under the ADA, as amended by the ADA Amendments Act ("ADAAA"), for "discrimination/retaliation." (Compl. 9.) He charges that Gagan LLC, Think Tank, DirectBuy, and UCC were all his employers for ADAAA purposes. (*Id.* ¶ 58.) His "discrimination" claim appears to be based on the theory that the Defendants failed to accommodate his disabilities in his work as an accounting business analyst (*id.* ¶ 61); failed to interact with him to address possible accommodations (*id.* ¶ 63); and treated Jimenez, a non-disabled employee with lesser qualifications, more favorably than Newman, because of his disabilities. (*See id.* ¶ 64.) His retaliation claim is essentially that the Defendants "forced" him into "an undesirable assignment" and inadequately trained him for the marketing room as punishment for requesting accommodation or "expressing that he intended to hire legal counsel and/or exercise [other unspecified] statutorily protected rights." (*See id.* ¶¶ 66, 68–69, 77.) He also outlines a claim for disparate treatment as a plaintiff who was "regarded as" disabled by his employers. (*See id.* ¶ 74.)

In Count II, Newman attempts to state claims against all the Defendants, including Laurie Gagan and James Gagan Jr., for "interference" and "retaliation" in violation of the FMLA. (*Id.* at 16.) Newman pleads that he had worked 1,250 hours during the twelve months preceding his "request for future FMLA leave around June 27, 2011, related to the birth of his . . . child," (*id.* ¶ 83) and that Think Tank and DirectBuy employed at least fifty persons within 75 miles of their businesses at 8450 Broadway, Merrillville, Indiana, 46410. (*Id.* ¶ 84.) Laurie Gagan and James Gagan Jr., he alleges, were "primary decision-makers concerning Newman." (*Id.* ¶ 85.) Newman

alleges that Defendants used his request for leave under the FMLA as a "negative factor in employment actions concerning" him (*id.* ¶ 86), and that "there is a causal link between [his] statutorily protected expressions and Defendants' employment decisions." (*Id.* ¶ 90.)

Count III is Newman's claim for wrongful discharge. Here, he alleges the Think Tank and DirectBuy Defendants fired him "in retaliation" for sustaining an injury covered by worker's compensation. (*Id.* ¶ 100.)

Plaintiff attempts in Count IV to state a claim for a breach of a duty of good faith and fair dealing, which he alleges the Defendants committed tortiously "[b]y failing to abide by the terms of the Agreement between the parties prior and subsequent to the termination of Newman." (*Id.* ¶¶ 107, 109.)

In Count V, Newman sets forth his promissory-estoppel claim. He alleges that the Defendants recruited him out of his independent-contracting business with the intent of inducing him to work only for Think Tank and DirectBuy. Newman claims "Defendants" enticed him in part with "[c]ommunications" by Laurie Gagan "and/or" James Gagan Jr. that caused Newman to believe he would hold the accounting business analyst position "for a minimum of two years" (*id.* ¶¶ 11, 112, 113), and that they would groom him "to replace Gene Deutsch as Chief Financial Officer of the Gagan Family of Companies." (*Id.* ¶¶ 11, 113.) Newman avers that he reasonably and detrimentally relied on these promises by shutting down his business. (*See id.* ¶¶ 116, 117.)

## 2. Pending Motions

Before the Court are two fully briefed motions to dismiss for failure to state a claim, one filed by UCC and DirectBuy, the other by the Gagan Defendants, plus two motions to strike.

UCC and DirectBuy's motion contends Newman cannot proceed against them as integrated affiliates of the Gagan Defendants, because they argue this theory is inconsistent with the Complaint. The Complaint incorporates Newman's Employment Agreement, and the Employment Agreement makes no mention of UCC or DirectBuy. UCC and DirectBuy also argue Newman has included too little factual detail to raise a plausible claim that they can be treated as his employer on the basis of affiliation with the Gagan Defendants. For these reasons, UCC and DirectBuy propose, all of Newman's Complaint should be dismissed as against them. Apart from that, they further urge the Court to rule that Newman's Counts for promissory estoppel and breach of the duty of good faith and fair dealing are insufficient to state a claim.

The Gagan Defendants agree that Newman has failed to plead facts showing the kind of integration necessary to aggregate their employee numbers with those of UCC and DirectBuy. They argue further that each ostensible cause of action fails, for reasons specified and addressed below.

Newman has responded to both motions, supporting his integrated-employer theory in part by adding allegations of facts he says he discovered only after filing the Complaint.

The briefing of the motions to dismiss ultimately spawned two more motions, which are motions to strike. Newman moves to strike exhibits 1 through 3 to the Gagan Defendants' motion to dismiss, arguing that the Court should not consider dismissing the Complaint on the basis of a review of items other than the Complaint, its attachments, and documents referred to in the Complaint and central to its claims. (Newman says he brings the motion to strike "under Rule 12(f)." Rule 12(f), however, covers only the striking of material found in pleadings, and a motion is not a pleading. *See* Fed. R. Civ. P. 7. The Court will disregard Newman's reference to Rule 12(f) and construe his motion in accordance with his apparent intent.)

UCC and DirectBuy, for their part, have moved to strike Newman's "separate appendix of evidence" and portions of his brief opposing their motion to dismiss. In opposing the motions to dismiss, Newman relies in part on a variety of new documents that he did not refer to, or incorporate into, his Complaint. UCC and DirectBuy's motion to strike is based on their understanding that plaintiffs may not do this. It's a misunderstanding, as shown by section C of this Order, below.

## B.  PLAUSIBILITY STANDARD

A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). *Ashcroft v. Iqbal* and *Bell Atlantic Corp. v. Twombly* interpret this to mean that allegations in the form of legal conclusions do not shield a complaint from dismissal upon a motion under Rule 12(b)(6) for failure to state a claim. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."). To withstand a Rule 12(b)(6) motion, the complaint must contain factual allegations that plausibly suggest, and are not merely consistent with, an inference of entitlement to relief. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 545 (2007) (so interpreting Rule 8(a)(2)).

What it takes to achieve plausibility depends on the nature of the claim. *See Iqbal*, 557 U.S. at 679 (describing review for plausibility as a "context-specific task"). More complex claims require more detailed factual allegations. *See McCauley v. City of Chi.*, 671 F.3d 611, 617 (7th Cir. 2011) (illustrating this through discussion of *Swanson v. Citibank, N.A.*, 614 F.3d 400 (7th Cir. 2010) and *Brooks v. Ross*, 578 F.3d 574 (7th Cir. 2009)).

In *Brooks*, the United States Court of Appeals for the Seventh Circuit synthesized the standard into three requirements:

> First, a plaintiff must provide notice to defendants of her claims. Second, courts must accept a plaintiff's factual allegations as true, but some factual allegations will be so sketchy or implausible that they fail to provide sufficient notice to defendants of the plaintiff's claim. Third, in considering the plaintiff's factual allegations, courts should not accept as adequate abstract recitations of the elements of a cause of action or conclusory legal statements.

578 F.3d at 581.

One last important point: "[w]hen evaluating the sufficiency of the complaint, we construe it in the light most favorable to the nonmoving party, accept well-pleaded facts as true, and draw all inferences in her favor." *Reger Dev., LLC v. Nat'l City Bank*, 592 F.3d 759, 763 (7th Cir. 2010) (citing *Tamayo v. Blagojevich*, 526 F.3d 1074, 1081 (7th Cir. 2008)).

### C.  SCOPE OF REVIEW

What are we looking at when we apply this standard? The present motions to dismiss bring this question to the forefront.

Obviously the reviewing court must consider the complaint itself. Less obviously, it should also take into account any extrinsic documents that are either incorporated into the complaint or referred to in the complaint and central to the claims under review. *See Tierney v. Vahle*, 304 F.3d 734, 738–39 (7th Cir. 2002); *Wright v. Assocs. Ins. Cos., Inc.*, 29 F.3d 1244, 1248 (7th Cir. 1994) ("[D]ocuments attached to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to his claim." (citing *Venture Assocs. v. Zenith Data Sys.*, 987 F.2d 429, 431 (7th Cir. 1993))). If the court considers granting an ostensible motion to dismiss for failure to state a claim under Rule 12(b)(6) in reliance on

anything else, then additional procedures are required; the motion must be converted into one for summary judgment under Rule 56. *See* Fed. R. Civ. P. 12(d).

Even so, whether a motion to dismiss can be *denied* on the basis of extrinsic documents is another matter, because Rule 12(d) is ultimately about affording the proper notice to a claimant whose cause of action is in jeopardy of being thrown out. UCC and DirectBuy's 1976 case regarding the scope of this Court's review does not address this facet of Rule 12(b)(6) procedures. *See Hill v. Trs. of Ind. Univ.*, 537 F.2d 248, 251 (7th Cir. 1976). Other cases do. For example, the Seventh Circuit has stated it will consider "new factual allegations raised for the first time on appeal," where those factual allegations are consistent with the complaint. *E.g.*, *Travel All Over the World, Inc. v. Kingdom of Saudi Arabia*, 73 F.3d 1423, 1428 (7th Cir. 1996). The basis for this approach is the practice of accepting the complaint's factual allegations as true and drawing all reasonable inferences in plaintiffs' favor. *Id. Iqbal* and *Twombly* have not changed this aspect of the review of a complaint upon a motion to dismiss. *See Mann v. Vogel*, 707 F.3d 872, 877 (7th Cir. 2013) (post-*Iqbal*) ("accepting all well-pleaded facts as true, and drawing all reasonable inferences in favor of" the plaintiff). And if extrinsic factual allegations that are consistent with the Complaint could not be the basis of denying a motion to dismiss, but could be used to support appellate reversal of an order granting a motion to dismiss, the resulting back-and-forth would waste litigants' and courts' resources. The Seventh Circuit agrees that a district court may consider materials outside the pleadings to the extent they are consistent with the complaint and support denying the motion to dismiss. *See Geinosky v. City of Chi.*, 675 F.3d 743, 745 n.1 (7th Cir. 2012) (noting that "[a] plaintiff . . . has much more flexibility in opposing a Rule 12(b)(6) motion and in appealing a dismissal" than her adversary does on its side of these procedural postures). Accordingly, the Court will consider Plaintiff's extrinsic documents insofar

as they are consistent with the Complaint and weigh against granting any part of the motions to dismiss. UCC and DirectBuy's motion to strike will be denied.

### D. ANALYSIS

#### 1. Affiliate Liability, Joint Employment, and Aggregation of Employees for Statutory Coverage

Newman contends he should be treated as an employee of not only Gagan LLC and Think Tank, which he claims were his counterparties in the Employment Agreement attached to his Complaint, but also UCC and DirectBuy Inc., with which he does not allege a written contract. His theory is that UCC and DirectBuy became his employers because they were "integrated" with Gagan and Think Tank with respect to their ownership, offices, operations, control of labor relations and personnel, banking, equipment, accounting, and record keeping. (*See* Resp. Opp. DirectBuy and UCC's Mot. Dism., DE 24, at 5.) In support, Newman cites *Papa v. Katy Industries, Inc.*, 166 F.3d 937 (7th Cir. 1999), and a four-factor test which he traces to *Rogers v. Sugar Tree Products, Inc.*, 7 F.3d 577, 582 (7th Cir. 1993). (*Rogers* derived the four factors from another circuit's decision, *York v. Tennessee Crushed Stone Association*, 684 F.2d 360, 362 (6th Cir. 1982).)

But although Newman cites *Papa*, he has somehow overlooked that it was in *Papa* of all cases that the Seventh Circuit expressly abandoned *Rogers*'s four-factor test for all contexts other than "determinations by the National Labor Relations Board of whether it has jurisdiction over an employer." *See Papa*, 166 F.3d at 939–43. The Defendants' briefs likewise give short shrift to finding the applicable standards of affiliate liability and joint-employer status. It is difficult to show any failure by Newman to raise a plausible aggregation-of-employees or joint-employer claim without properly identifying the governing standards.

In *Papa*, the Seventh Circuit decided how to determine whether an employer with too few employees of its own to be covered by "the major federal antidiscrimination laws" (including the ADA) is nevertheless subject to them as the result of affiliation with other businesses. Which affiliates' employees may be added to satisfy the statutory minimum number of employees for coverage? *See id.* at 939. The Court settled on three situations that make aggregation of affiliates' employees appropriate:

> The first situation is where, the traditional conditions being present for "piercing the veil" to allow a creditor, voluntary or involuntary, of one corporation to sue a parent or other affiliate, the parent or affiliates of the plaintiff's employer would be liable for the employer's debts. . . . Second, an enterprise might split itself up into a number of corporations, each with fewer than the statutory minimum number of employees, for the express purpose of avoiding liability under the discrimination laws. . . . Third, the parent corporation might have directed the discriminatory act, practice, or policy of which the employee of its subsidiary was complaining.

*Id.* at 940–41 (citations omitted).

The inquiry of whether two entities are joint employers for purposes of the FMLA is related, but not identical. We know of one condition that "generally" is necessary, others that can be relevant, depending on the case, and still another that would typically suffice on its own. First, the one that's generally necessary: For joint employers to exist under the FMLA regime, each alleged employer generally "must exercise control over the working conditions of the employee, although the ultimate determination will vary depending on the specific facts of each case." *Moldenhauer v. Tazewell-Pekin Consol. Comms. Ctr.*, 536 F.3d 640, 644 (7th Cir. 2008). Other factors, "such as whether the alleged employer (1) had the power to hire and fire employees, (2) supervised and controlled employee work schedules or conditions of payments, (3) determined the rate and method of payment, and (4) maintained employment records . . . are certainly relevant," though likely not exhaustive of everything that might properly be considered. *Id.* Finally, it appears the division of an organization "into smaller entities with fewer than the

statutory minimum number of employees for the express purpose of avoiding FMLA obligations" is always or nearly always a sufficient condition for joint-employer treatment. *See id.* at 645 (citing *Papa*, 166 F.3d at 941).

Newman will need considerable factual detail to raise a plausible inference of affiliate liability, because applying these tests is somewhat intricate. *See McCauley*, 671 F.3d at 617 (explaining the plausibility standard is context specific in this way).

The Court turns now to that task. UCC and DirectBuy's joint motion to dismiss argues first that Newman's self-titled "integrated employer" theory is inconsistent with the Complaint. The claimed inconsistency lies in part in the fact that the Complaint incorporates the Employment Agreement, and the Employment Agreement makes no mention of UCC or DirectBuy. (*See* Mem. Supp. Mot. Dism. of DirectBuy and UCC, DE 19, at 5–6.) UCC and DirectBuy overlook that even if the Employment Agreement purported on its face to do so, it likely could not foreclose the possibility of an entity other than Gagan LLC or Think Tank becoming subject to federal employment statutes upon a claim by Newman. Anyway the text of this Agreement *doesn't* purport to do that. On its face, it simply sets forth Newman's contract with Gagan LLC and Think Tank as of the date they entered into it.

UCC and DirectBuy also urge, along similar lines, that Newman's theory is inconsistent with his Complaint in that he has alleged Gagan LLC and Think Tank committed some of the acts giving rise to his claims without mentioning UCC and DirectBuy in the same breath. (*See id.* (citing portions of the Complaint where Newman alleged "Gagan/Think Tank decided to eliminate his position;" "Gagan/ThinkTank informed [Plaintiff] that he would remain on a leave of absence;" and so on).) All Plaintiff has done, however, is allege on the one hand that Gagan LLC and Think Tank committed some acts that make them answerable for his charges, and on

the other that different persons and entities committed other acts that made them responsible, as well. These claims are logically consistent and plausible. For now the Court must "accept[] all well-pleaded facts as true, and draw[] all reasonable inferences in favor of" Newman. *See Mann v. Vogel*, 707 F.3d at 877.

UCC and DirectBuy's opening brief's third and final argument for wholesale dismissal was that Newman's "conclusory statements" of the facts cannot nudge his claims against them from conceivable to plausible. (*See* DE 19 at 6.) In that opening brief, UCC and DirectBuy dedicated only two sentences to this argument, but it presents a closer call than their inconsistency claim does.

The reason Newman's claims against UCC and DirectBuy ultimately withstand this attack is that his opposition brief and Complaint allege enough concrete facts to raise plausible inferences that there was considerable integration between the various entity Defendants, and that managers from each were involved in taking adverse actions against him. In turn, these inferences, if true, would make it reasonable to conclude that each entity Defendant participated in directing the violations he complains of. *See Papa*, 166 F.3d at 941. For example, we have the following:

- UCC was the parent of DirectBuy, of which Gagan LLC operated a franchise. (*See* Compl. ¶ 5; DE 24 at 7–8.)

- Don Sone . . . held the position of Marketing Room Manager and had direct supervisory authority over Newman . . . . Sone is employed by DirectBuy and UCC. Sone used Gagan's workplace, equipment, supplies, and staff to perform his job functions at DirectBuy and UCC. . . . Gagan directed the performance of Sone's work and controlled his work schedules. Sone directed Newman's work.

  (Compl. ¶ 37.)

- "Around December 30, 2011, Defendants advertised with careerbuilder.com for" a position similar to Newman's accounting business analyst job. The new employee would

operate under the umbrella of the "'Gagan Family of Companies,'" which, Newman alleges, comprised Gagan LLC, DirectBuy, and Think Tank. (*Id.* ¶ 48 (quoting the advertisement).)

- Laurie Gagan, an employee of Think Tank and DirectBuy (*id.* ¶ 7), suggested in a May 18, 2010, email to Newman that if his career progressed within those organizations, he could one day replace Gene Deutsch (*see* Ex. C to Compl.), an executive of UCC. (DE 24 at 8.)

- DirectBuy pays "certain Gagan LLC personnel through UCC." (*Id.* at 9.)

- Newman was subject to personnel policies and standards promulgated by the DirectBuy franchisor and identified by his response to UCC and DirectBuy's motion. (*See id.*)

- "DirectBuy Corporate's" internal auditor, Janet Davidson, "hand-delivered" a training guide to Newman "because of the close proximity of UCC/DirectBuy, Gagan LLC and ThinkTank." (*Id.*)

- Defendants' stated reason for firing Newman was his violation of policies covering marketing-room staff that UCC and DirectBuy promulgated. (*See id.* at 10.)

As UCC and DirectBuy point out in their reply, Newman's brief and Complaint equivocate somewhat in their use of the name "DirectBuy." Where possible, we should distinguish between a franchisee that calls itself a DirectBuy business, such as "Gagan, LLC, d/b/a DirectBuy of Southlake" (Compl., Ex. F), with an address of 101 West 84th Street, and DirectBuy Inc., which Newman has described as a franchisor with a corporate headquarters at 8450 Broadway. But some of this ambiguity comes from the Defendants' alleged practice of allowing franchisees to call themselves "DirectBuy." Anyway the above factual allegations make plausible Newman's (otherwise conclusory) claim that "Gagan, ThinkTank, UCC and DirectBuy . . . share common

management, interrelation among/between their operations, centralized control of their human resources/benefits, and a degree of common ownership and control." (*Id.* ¶ 49.) As such, it is also plausible UCC and DirectBuy directed the discriminatory acts of which Newman complains. *See Papa*, 166 F.3d at 941 (making that condition sufficient).

The Gagan Defendants' motion to dismiss raises the related issue whether Newman has pleaded the facts needed for a plausible inference they were subject to the FMLA. The Gagan Defendants argue Newman's factual allegations fall short for two reasons. First, they say he did not allege that they employed at least fifty employees on their own. *See* 29 U.S.C. § 2611(2)(B)(ii) (excluding from eligibility "any employee of an employer who is employed at a worksite at which such employer employs less than 50 employees if the total number of employees employed by that employer within 75 miles of that worksite is less than 50"); (4)(A)(i) (requiring for coverage that an employer had "50 or more employees for each working day during each of 20 or more calendar workweeks in the current or preceding calendar year"). But the Gagan Defendants—remember, they include Think Tank—have either overlooked part of the Complaint, or they read Newman's allegations more narrowly than the Court may upon a Rule 12(b)(6) motion. (*See* Compl. ¶ 84 ("During times relevant to Plaintiff's Complaint, ThinkTank/DirectBuy Defendants employed 50 or more individuals within a 75-mile radius of the business entities located at 8450 Broadway, Merrillville, Indiana, 46410.").) Giving Newman the benefit of the reasonable inferences from his factual allegations, *see Mann v. Vogel*, 707 F.3d at 877, means construing him to be referring here to Gagan LLC's DirectBuy franchise, not DirectBuy Inc., the franchisor. And Defendants have cited no case ruling that this degree of factual specificity is inadequate to raise a plausible inference of employer coverage by the FMLA. As a result of this allegation, Plaintiff can proceed on an FMLA claim against the Gagan

Defendants even without raising an inference that UCC and DirectBuy Inc. should be treated as joint employers.

Anyway it turns out he's accomplished just that. The factual allegations presented above in bullet points reasonably support the inferences required by *Moldenhauer*, 536 F.3d at 644, for joint-employer treatment under the FMLA. It is plausible from those allegations that each entity controlled Newman's working conditions, had the shared power to hire and fire him, supervised and controlled his work, determined his pay, and so on. *See id.* (identifying these relevant factors).

## 2. Plausibility of Each Cause of Action

In the following segments, the Court addresses the rest of the Defendants' attacks on Newman's Complaint, claim by claim.

### *a. Count I, for Violation of the ADA*

The Gagan Defendants have raised three challenges to Newman's ADA claims. First, they argue his factual allegations do not show a qualifying disability; second, that he has not plausibly alleged a denial of accommodation; and third, that his retaliation allegations are implausible.

#### i. Disability

The facts Plaintiff has alleged to show he qualified as disabled are that he had prescription medication, suffered a physical injury at work around January 14, 2011, and that when a physician released him to work on April 18, 2011, the physician limited Plaintiff to sedentary activities so that he would not lift over ten pounds or operate machinery. By June 10, 2011,

Plaintiff was allowed to return to work without the limitation to sedentary work or restriction from lifting. Even then however, "Newman was to use a cane and continue medication for pain." (Compl. ¶ 31.)

These allegations are not exactly a model of detail and clarity. But they are specific and factual, and they show that for a time, Plaintiff was "substantially limited" in lifting, which the ADA defines as a major life activity. *See* 42 U.S.C. § 12102(1), (2) (defining disability as a "physical or mental impairment that substantially limits one or more major life activities" and specifying in subparagraph (2) that lifting is a major life activity). The apparently transitory nature of Plaintiff's lifting impairment does not automatically negate the conclusion that he qualified as disabled under the ADAAA standard, *see* 29 C.F.R. § 1630.2 ("The effects of an impairment lasting . . . fewer than six months can be substantially limiting within the meaning of this section."), and Defendants have not persuaded the Court that it should in this particular case.

Almost all of Defendants' cases were decided before the substantial liberalizations of the 2009 ADA Amendments Act, which applies here. *See Powers v. USF Holland, Inc.*, 667 F.3d 815 (7th Cir. 2011) (applying the pre-ADAAA standard because the alleged violation occurred before 2009); *Simonson v. Trinity Reg'l Health Sys.*, 336 F.3d 706 (8th Cir. 2003) (pre-ADAAA decision); *Contreras v. Suncast Corp.*, 237 F.3d 756, 763 (7th Cir. 2001) (discussing the pre-ADAAA standard); *Abdul-Aziz v. Show Dep't, Inc.*, No. 09-cv-7609, 2010 WL 3516157 (N.D. Ill. Aug. 25, 2010) (pre-ADAAA standard); *Tate v. Ill. Worker's Compensation Comm'n*, No. 08-C-5261, 2010 WL 1418400 (N.D. Ill. Apr. 6, 2010) (same); *Mounts v. United Parcel Serv. of Am., Inc.*, No. 09 C 1637, 2009 WL 2778004 (N.D. Ill. Aug. 31, 2009) (same). Defendants' only case where the ADAAA arguably may have been applicable did not acknowledge the ADAAA and relied exclusively on only pre-ADAAA appellate decisions. *See Chi. Reg'l Council of*

*Carpenters, United Bhd. Carpenters & Joiners of Am. v. Berglund Constr. Co.*, No. 12 C 3604, 2012 WL 3023422 at *2 (N.D. Ill. July 24, 2012). The difference the ADAAA makes is significant, as another district court within our circuit has explained, referring to the statute and regulations:

> The ADAAA provides more generous coverage than the ADA by providing that the definition of disability "shall be construed in favor of broad coverage of individuals . . . to the maximum extent permitted by the terms of [the Act.]" 42 U.S.C. § 12102(4)(A). The associated regulations instruct courts to be liberal in determining whether a plaintiff is substantially limited: "[t]he term 'substantially limits' shall be construed broadly in favor of expansive coverage, to the maximum extent permitted by the terms of the ADA. 'Substantially limits' is not meant to be a demanding standard." 29 C.F.R. § 1630.2(j)(1)(i).

*Graham v. St. John's United Methodist Church*, No. 12-CV-297-MJR, 2012 WL 5298156 at *3 (S.D. Ill. Oct. 25, 2012). So Defendants have not identified a failure to plead facts that give rise to the inference of a qualifying ADAAA disability.

### ii. Failure to Accommodate

In this portion of their motion, the Gagan Defendants begin by going back to their argument that Plaintiff failed to plead the facts showing a qualifying disability "as opposed to temporary medical restrictions," (DE 21 at 11) which the Court has already addressed.

Next, they claim Newman failed to "allege basic facts such as what accommodation he allegedly requested, when, and from whom." (*Id.* at 12.) The critique is not entirely accurate, however. In paragraphs 24 and 25 of the Complaint, Newman alleges he requested a handicapped parking space and that he was scheduled to meet in late April 2011 with Laurie and Jim Gagan "to discuss . . . returning to work to perform . . . accounting duties. Newman believed he could perform his accounting business analysis and human resources job with or without accommodation." The Court must accept these facts as true for now, and draw all reasonable

inferences in Newman's favor. *See Mann v. Vogel*, 707 F.3d at 877. So the Court must infer for present purposes that around April 2011, Plaintiff was in the process of requesting accommodation for physical disability from Laurie Gagan and Jim Gagan Jr.

Defendants also take exception with Plaintiff's statement in his charge of discrimination to the Equal Employment Opportunity Commission that he could have done his job "with or without accommodation." This attack amounts to a play on the apparent ambiguity of the language in the charge. Defendants seem to read Newman to say he could have done his job without accommodation. But it would be inconsistent with the Court's duty to draw the reasonable inferences in Plaintiff's favor to give this phrase the meaning Defendants urge. Instead, the Court reads Newman's charge to assert in this part simply that he could have performed if he had received proper accommodation. That is, he could have performed with accommodation, which would make it also true that he could have performed *with* "or without" accommodation.

Finally, Defendants argue the allegation that Newman was able to return to work without obtaining a handicapped parking space shows that the space was not a "reasonable accommodation" for his disability. But of course by the time he returned to work, the Complaint implies, Newman's physical condition had improved.

These attacks stop short of showing that Newman's failure-to-accommodate warrants dismissal.

### iii.  Retaliation

Defendants' attack on Newman's retaliation claim proceeds from the premise that he failed to allege that he engaged in statutorily protected activity. Because the statute expressly prohibits

retaliation only for the plaintiff's opposition to an ADA-prohibited act or practice "or because such individual made a charge, testified, assisted, or participated . . . in an investigation, proceeding, or hearing," 42 U.S.C. § 12203, this argument has some superficial appeal.

Notwithstanding the statutory text, however, many cases have treated a request for accommodation as a protected activity, or assumed it qualifies as such. *See, e.g.*, *Contreras*, 237 F.3d at 765 (analyzing causation by considering whether a request for accommodations factored into an employer's decision to dismiss the plaintiff); *Silk v. City of Chi.*, 194 F.3d 788, 801 (7th Cir. 1999) (referring to a request for accommodation as protected activity); *Lester v. Nestle USA, Inc.*, No. 1:11-CV-1441-MJD, 2012 WL 3114566 at n.2 (S.D. Ind. July 31, 2012) (assuming "that a request for accommodation . . . is a statutorily protected activity"); *Digan v. Euro-Am. Brands, LLC*, No. 10-CV-799, 2012 WL 2018529 at *10 (N.D. Ill. June 5, 2012) (same); *Williams v. Eastside Lumberyard & Supply Co., Inc.*, 190 F. Supp. 2d 1104, 1122 (S.D. Ill. 2001) (following *Contreras* and *Silk*); *cf. Cassimy v. Bd. of Educ. of Rockford Pub. Sch., Dist. No. 205*, 461 F.3d 932, 938 (7th Cir. 2006) (explaining "everyone agree[d] that [the plaintiff] engaged in statutorily protected expression when he requested an accommodation"). And this Court, giving Newman the benefit of the reasonable inferences to be drawn from his Complaint, *see Mann v. Vogel*, 707 F.3d at 877, takes Newman at his word that he did make a request for accommodation. (*See* Compl. ¶¶ 23–27.) Defendants' argument that he failed to state an ADA retaliation claim therefore fails.

## b. Count II, for Violation of the FMLA

The Gagan Defendants contend Newman's FMLA claim must be dismissed because he has not plausibly alleged (1) that they were subject to the FMLA or (2) that he was eligible for leave. This Order has already dealt with part (1), *supra*, pp. 17–18; it now addresses part (2).

To be eligible for FMLA leave, Newman needed at least 1,250 accumulated hours of work for his employer during the twelve months preceding his leave. *See* 29 U.S.C. § 2611(2)(A)(ii) (limiting eligible employees to those who were employed "for at least 1,250 hours of service with [the given] employer during the previous 12-month period"); 29 C.F.R. § 825.110(d) ("The determination of whether an employee meets the hours of service requirement and has been employed by the employer for a total of at least 12 months must be made as of the date the FMLA leave is to start."). According to the Gagan Defendants, Newman's problem here is that he admitted a leave of absence of several months,[5] from about January 14, 2011, until about June 21, 2011, (*see* Compl. ¶¶ 20, 22, 29, 34) and did not specify exactly when his leave period would have begun. As a result, the Gagan Defendants propose, it is implausible Newman would have been eligible for FMLA leave.

The Court disagrees. It is well within the bounds of plausibility that Newman would have qualified by the beginning of his requested leave period. To see this, consider the plausible assumption Newman averaged 50 hours of work in each week he worked. At that rate, he would need 25 weeks of work to accumulate 1,250 hours. According to the Complaint, Newman returned to work around June 21, 2011, and was terminated about 1 week later (Compl. ¶¶ 35, 46), so he allegedly worked 1 week in June 2011. Counting the remaining 24 weeks back from the approximate date of his injury, January 14, 2011, we land at July 30, 2010. So even if

---

[5] It is unclear how the Gagan Defendants arrived at their computation that the leave of absence lasted six months. (*See* Gagan Defs.' Br. Supp. Mot. Dism., DE 21, at 18.) In fact, there were only 158 days—or about five months and one week—between January 11, 2011, and June 21, 2011.

Newman would have stopped working on June 28 without being fired, under the plausible assumption that he averaged 50 hours of work per week during the weeks he did work, Newman still had about another month after making his request before his accumulated eligibility for FMLA leave would expire. It is likewise plausible his requested leave for the impending birth of his child would have begun in that time.

Moreover, the gaps in Newman's allegations pertaining to his FMLA eligibility are not serious enough that the practical benefit of having him fill them in would be worth the expenditure of litigants' or the Court's resources. *See Bennett v. Schmidt*, 153 F.3d 516, 518 (7th Cir.1998) ("Instead of lavishing attention on the complaint until the plaintiff gets it just right, a district court should keep the case moving.").

### c. Count III, for Wrongful Discharge

The Gagan Defendants argue Newman has stated no plausible claim for wrongful discharge motivated by his sustaining a "worker's compensation injury." (*See* DE 21 at 18–19; Compl. ¶ 100.) They point out that according to his own allegations, he was subjected to the claimed retaliation "over six months after his workers' compensation injury and after receiving full workers' compensation benefits." (DE 21 at 19.) Under *Goetzke v. Ferro Corp.*, 280 F.3d 766, 775 (7th Cir. 2002), affirming a district court's grant of summary judgment, they contend a plaintiff proceeding on a theory of illegal retaliatory termination needs close temporal proximity to raise a reasonable inference of causation. But for now, factual allegations raising a plausible inference of retaliation are all he needs.

And he has provided enough of those. In *Swanson*, 614 F.3d at 405, the Seventh Circuit ruled that it sufficed for a plaintiff claiming racial discrimination in violation of the Fair Housing Act

to plead "the type of discrimination that she [thought] occur[red] . . . , by whom . . . , and when." Those basic factual allegations made the inference of discrimination plausible. *See id.* Applying this guidance, the Court recognizes Newman has identified the type of wrongful discharge he believes occurred (retaliation for a worker's compensation-covered injury (Compl. ¶ 100)), by whom (the Think Tank and DirectBuy Defendants, including their agents, Don Sone, Laurie Gagan, and James Gagan Jr. (Compl. ¶ 104)), and when (less than one week after June 21, 2011 (Compl. ¶ 97–98)). The Court sees no convincing reason why more factual detail should be needed to plead retaliatory causation in a wrongful-discharge claim involving worker's compensation than it takes for discriminatory causation in a race case under the Fair Housing Act.

### d. Count IV, for Breach of the Duty of Good Faith and Fair Dealing, and Count V, for Promissory Estoppel

In pleading Count IV, Newman relies on "a duty of good faith and fair dealing during [Defendants' and Newman's] discussions, negotiations and agreements concerning the employment of Newman as an Accounting Business Analyst at ThinkTank/DirectBuy Defendants." (Compl. ¶ 106.)

The parties have not cited, and the Court has not located, a case stating the elements of the cause of action for breach of the covenant of good faith and fair dealing under Indiana law within the employment field.[6] To be sure, such a cause of action does exist; *see, e.g., Allison v. Union*

---

[6] According to Williston, one element of this claim would be that the "defendant, as employer, engaged in conduct, *separate and apart from the performance of obligations under the contract*, without good faith and for the purpose of depriving the plaintiff, as employee, of rights and benefits under the contract." Williston on Contracts (4th ed.) § 38:15 (West 2012) (emphasis added). If this is also an element under Indiana law, Newman seems to misunderstand it, as he has alleged that Defendants breached their duty of good faith and fair dealing "[b]y failing to abide by the terms of the Agreement between the parties." (Compl. ¶ 107.) For this reason alone, Newman may have failed to state a claim for breach of the covenant of good faith and fair dealing. The Court will not dismiss the claim on this basis, however, because Indiana's courts, not Williston, determine the common law of Indiana.

*Hosp., Inc.*, 883 N.E.2d 113, 123 (Ind. Ct. App. 2008) ("Indiana courts have recognized an implied covenant of good faith and fair dealing in contract law, but generally only in limited circumstances involving employment contracts and insurance contracts."); though not "'in employment at will contexts.'" *N. Ind. Pub. Serv. Co. v. Dabagia*, 721 N.E.2d 294, 300 (Ind. Ct. App. 1999) (quoting *Mehling v. Dubois County Farm Bureau*, 601 N.E.2d 5, 8 (Ind. Ct. App. 1992)).

Newman's Employment Agreement, which the Court may consider in favor of dismissal because he attached it to his Complaint; *see Vahle*, 304 F.3d at 738–39; *Wright*, 29 F.3d at 1248; reveals that he began as an employee at will (Ex. A to Compl. at ¶ 6), and that the Agreement integrated "the entire understanding and agreement between the Employer and Employee with regard to all matters" contained in it. (*Id.* ¶ 18.) The Agreement further provided that it could "be amended and modified only in writing, signed by both parties." (*Id.*)

The Gagan Defendants argue Newman's count for breach of the duty of good faith and fair dealing should be dismissed on the ground that there is no such cause of action in the at-will context. Newman responds by referring to paragraph 11 of his Complaint, where he alleged that "[c]ommunications with Laurie Gagan and/or James Gagan Jr., made Newman believe he would hold the position of Accounting Business Analyst for a minimum of two years, and would be groomed to replace Gene Deutsch as Chief Financial Officer." Newman has not identified when these alleged communications took place, but, as we shall see, his attempted claim would be doomed even if he supplied that detail.

The following analysis would apply if the "communications" preceded the Employment Agreement: "Indiana follows the general rule that parol evidence may not be used 'to vary or contradict a written contract complete on its face.'" *Deckard v. Gen. Motors Corp.*, 307 F.3d

556, 563 (7th Cir. 2002) (quoting *State Highway Comm'n v. Wilhite*, 218 Ind. 177, 180–81 (1941)).[7] "The parol evidence rule 'excludes evidence of prior or contemporaneous oral and written agreements which would vary a written contract.'" *Id.* (quoting R.W. Gascoyne, Annotation, *Applicability of parol evidence rule in favor of or against one not a party to contract of release*, 13 A.L.R.3d 313, § 2b (2001) and inserting the words *and written* after *oral* (brackets omitted)). So as between Newman and his counterparties, the Employment Agreement nullified the contractual effect of any earlier alleged "communications."

And if, on the other hand, the "communications" came after the Employment Agreement, then they could not change his at-will status unless they were reduced to writing and signed by Newman and his Employers. (*See* Compl., Ex. A, ¶ 18.)

Newman has neglected to allege that the "communications" were written and signed by all parties, so his story of the purported breach of the duty of good faith and fair dealing does not, legally speaking, hold together with respect to Gagan LLC and Think Tank. *See Swanson*, 614 F.3d at 404 (7th Cir. 2010) ("[T]he plaintiff must give enough details . . . to present a story that holds together."). His count for breach of the duty of good faith and fair dealing therefore fails against them.

The Court recognizes in reaching this conclusion that a *presumption* of at-will employment arising from a contract of indefinite duration may be overcome under Indiana law in three situations: cases of "adequate independent consideration" for more permanent employment, cases where strict application of the at-will doctrine would violate public policy, and promissory estoppel. *See Orr v. Westminster Vill. N., Inc.*, 689 N.E.2d 712, 718 (Ind. 1997). But because of the integration clause and the explicitly "at will" terms of Newman's Employment Agreement,

---

[7] "Although the parol evidence rule has a procedural name, it is in fact a rule of contract formation . . . ." *Mohr v. Metro E. Mfg. Co.*, 711 F.2d 69, 72 (7th Cir. 1983). Accordingly, applying the parol-evidence rule does not mean the Court is considering evidence in the traditional sense, so as to violate Rule 12(d).

at-will was not just a presumption as between Newman and Employers Gagan LLC and Think Tank, *it was Newman's status*, until modified by a writing signed by those parties. *Cf. id.* at 717 ("The employment-at-will doctrine is a rule of contract construction, not a rule imposing substantive limitations on the parties' freedom to contract."). In other words, the rule that employment contracts of unspecified duration are presumptively at will does not mean that expressly at-will employment agreements are only presumptively so.

> The existence of express terms in a valid contract precludes the substitution of and the implication in law of terms regarding the subject matter covered by the express terms of the contract. When the rights of parties are controlled by an express contract, recovery cannot be based on a theory implied in law. Implied covenants are not favored in Indiana, especially where they restrict the freedom to enter into contracts.

*Keystone Carbon Co. v. Black*, 599 N.E.2d 213, 216 (Ind. Ct. App. 1992) (citations omitted).

So far so good for Gagan LLC and Think Tank, because as parties to the Employment Agreement, they can hold it against him. UCC and DirectBuy, on the hand, did not sign the Employment Agreement, and Newman seeks to invoke promissory estoppel against them, too.[8] As the Gagan Defendants pointed out in their brief, however, a promise of two years' employment is within Indiana's statute of frauds, *see* Ind. Code Ann. § 32-21-1-1(b)(5) (prohibiting "[a]n action involving any agreement that is not to be performed within one (1) year from the making of the agreement" without a related writing signed by the defendant), and Newman has not alleged the existence of a writing signed by a representative of UCC or DirectBuy Inc. that relates to such a guarantee.

Promissory estoppel may overcome the statute of frauds, but only where the defendant's "refusal to carry out the terms of the agreement has resulted not merely in a denial of the rights

---

[8] There is some inconsistency in this attempt, because Newman argues *all* the entity Defendants were parties to his Employment Agreement (*see* Resp. Opp. Gagan LLC and Think Tank's Mot. Dism., DE 29, at 16), but the Court will set that aside for the moment.

which the agreement was intended to confer, but the infliction of an unjust and unconscionable injury and loss." *Whiteco Indus., Inc. v. Kopani*, 514 N.E.2d 840, 845 (Ind. App. 1987) (quoting *Starkey v. Galloway*, 119 Ind. App. 287, 84 N.E.2d 731, 734 (1949)). The narrowness of this exception makes good sense:

> Were this not the rule the statute would be rendered virtually meaningless because the frustrated claimant would always assert an oral promise/agreement to defeat by means of estoppel the statute's requirement for a written one. The contest would then concern the credibility of the evidence of an oral promise or agreement. That, of course, is precisely what the statute seeks to avoid.

*Id.* at 844. In *Kopani*, the Court of Appeals found no unconscionable injury because the injuries the plaintiffs relied on were "the kind of adverse consequences which normally attend the involuntary termination of someone's employment." *Id.* at 846. Viewed by this standard, Newman's Complaint does not allege specific facts plausibly indicating that he suffered an "unconscionable" injury.

Count V fails as against Gagan LLC and Think Tank for the additional reason that he needed, but did not raise, a plausible inference of *reasonable* reliance on their supposed promise of two years' employment. *See Lightle v. Harcourt Mgmt. Co., Inc.*, 634 N.E.2d 858, 860 (Ind. Ct. App. 1994) (providing the elements of promissory estoppel under Indiana law). The Complaint admits Exhibit A is Newman's Employment Agreement with Gagan LLC and Think Tanks. That Employment Agreement expressly provided at-will employment, terminated the effectiveness of any prior agreement, and required a writing signed by all parties to effect a modification later. So even if, as Newman alleges, someone once told him he was assured of two years' employment with Defendants, he could not plausibly have reasonably believed that was enforceable against the Gagan Defendants unless in writing and signed by them.

**E. CONCLUSION**

The motions to dismiss (DE 18, 20) are **DENIED** as to Counts I, II, and III, and **GRANTED** as to Counts IV and V. Accordingly, Counts IV and V of Newman's Complaint are **DISMISSED**. In response to Newman's informal request for leave to amend his pleading (*see* DE 29 at 18), the Court allows him fourteen days to file and serve a proper motion for leave to amend the complaint, attaching his proposed amended complaint. (*See* N.D. Ind. L.R. 15-1.)

UCC and DirectBuy's motion to strike (DE 28) is **DENIED**.

Newman's motion to strike (DE 30) is also **DENIED**. (The Court decided the motions to dismiss without finding any reason to consider the submissions Newman's motion sought to strike.)

**SO ORDERED** on March 28, 2013.

　s/ Joseph S. Van Bokkelen　
JOSEPH S. VAN BOKKELEN
UNITED STATES DISTRICT JUDGE